## In the Matter of CHICAGO EXPRESS, INCORPORATED, Debtor.

United States District Court
S. D. New York.
Sept. 30, 1963.

Krause, Hirsch, Gross & Heilpern, New York City, for debtor, Sydney Krause, and Myron Kove, New York City, of counsel.

Conboy, Hewitt, O'Brien & Boardman, New York City, for petitioner, Pennsylvania Railroad Co., Edward F. Butler, and Myron D. Cohen, New York City, of counsel.

FEINBERG, District Judge.

This is a petition to review an order, dated June 10, 1963, of the Referee in a Chapter XI proceeding. The Referee denied priority status to a claim of The Pennsylvania Railroad Company (the "Pennsylvania") in the alleged amount of $265,965.75, which represents freight charges incurred by Chicago Express, Incorporated (the "Debtor") in the two and one-half month period prior to the filing of the Chapter XI petition on May 11, 1962.

On appeal from an earlier order of the Referee, dated December 17, 1962, disallowing the priority status of the Pennsylvania's claim, Judge Levet remanded the proceedings to the Referee with instructions to vacate the order and to

make formal findings of fact and conclusions of law.[1] The Referee was directed specifically to indicate fully the relationship of the Pennsylvania to the Debtor, and the facts with respect to the "trust fund" theory advanced by the Pennsylvania. A summary of the facts, as found by the Referee, follows.

The Debtor is a common carrier by motor vehicle. Pursuant to a Tariff[2] filed with the Interstate Commerce Commission, the Debtor and a number of other motor carriers have entered into an arrangement with the Pennsylvania, a common carrier by rail. Under this arrangement, technically referred to as "substituted freight service," the trailers of the participating motor carriers are carried "piggy-back" on flat cars of the Pennsylvania between designated points. The charges for the substituted rail service are not set by the Tariff, but are provided for in an agreement in the form of a "divisional sheet"[3] published by the Pennsylvania. The rates are determined on the basis of several variable factors, including the number of trailers transported during a particular month, the weight of the trailer, and the distance traveled.

At the time the Pennsylvania receives a trailer from the Debtor, a "truck-train waybill," prepared by the Debtor, is submitted to the Pennsylvania for rating, preparation of a freight bill, and charging of the Debtor's account. The Pennsylvania makes no inquiry as to the amount of the overall charge made by the Debtor to its customers and is entitled to payment within fifteen days from the date of billing regardless of any agreement by the Debtor with, or collection by the Debtor from, its shippers or consignees. This fifteen day period is referred to in the "divisional sheet" as a "credit accommodation," which is subject to suspension if payment is not timely made.[4]

The Referee concluded that (1) the Pennsylvania's claim is not entitled to priority treatment under the "six-months rule," and (2) the proceeds of accounts receivable owing to the Debtor by its consignees and shippers were not impressed with a trust in favor of the Pennsylvania.

I

The Pennsylvania contends here that its participation in the "piggy-back" hauls[5] constituted services entitling it to priority treatment under the "six-months rule."

The so-called "six-months rule" was originally formulated by the Supreme Court in an early railroad receivership case, Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339 (1878). Briefly stated, it gives to unsecured creditors, whose claims were incurred as operating expenses of the debtor within a reasonably short time prior to receivership (normally six months), priority of payment over both secured and other unsecured creditors. See 6 Collier, Bankruptcy ¶ 9.13(5), at 2852–53 (14th ed. 1947) and cases cited therein. The Pennsylvania's contention poses sharply the issue whether the "six-months rule" should be applied to a non-railroad common carrier and, if so, whether it should be applied, in any event, in a Chapter XI proceeding.

Although the Supreme Court has not considered the applicability of the "six-months rule" to debtors other than railroads,[6] the lower federal courts have ex-

1. In the Matter of Chicago Express, Inc., 62B.373, S.D.N.Y., Feb. 15, 1963.

2. Tariff 34–V, filed under MF–ICC A–200, Pennsylvania's Exhibit 2.

3. P.R.R. Divisional Basis 9599–D and Supplements, Pennsylvania's Exhibit 3.

4. Pennsylvania's Exhibit 3, Item 150 at p. 9.

5. The Debtor concedes that the relationship between the parties is that of connecting carriers engaged in a joint haul, and not that of shipper and carrier. Brief for Debtor, p. 40.

6. The Court, in Wood v. Guarantee Trust and Safe Deposit Co., 128 U.S. 416, 421, 9 S.Ct. 131, 132–133, 32 L.Ed. 472 (1888), stated that the rule:

"lays great emphasis on the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad

tended the rule to public and quasi-public service companies. Keelyn v. Carolina Mut. Tel. & Tel. Co., 90 F. 29 (C.C.D.S. C.1898) (telephone and telegraph company); Central Trust Co. v. Clark, 81 F. 269 (8 Cir. 1897) (street railway); Atlantic Trust Co. v. Woodbridge Canal & Irrigation Co., 79 F. 39 (C.C.N.D.Cal. 1897) (irrigation company); see Fitz-Gibbon, The Present Status of the Six Months' Rule, 34 Colum.L.Rev. 230, 233 n. 8 (1934).

The paramount consideration in the origin of the rule was the public interest in the continued operation of "a great public work," Wood v. Guarantee Trust and Safe Deposit Co., 128 U.S. 416, 421, 9 S.Ct. 131, 132–133, 32 L.Ed. 472 (1888). The Court of Appeals for this Circuit, however, has indicated that the priority rests upon a broader principle, equitable in nature, which requires the lienholders to yield to those creditors whose services and supplies have preserved the value of the secured property. Dudley v. Mealey, 147 F.2d 268 (2 Cir.), cert. denied, 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945). In Dudley the Court applied the "six-months rule" to a hotel in a Chapter X reorganization, reasoning that the continued operation of such an enterprise depends upon goodwill, the preservation of which is necessary to maintain the value of the lienholders' security.[7] Id. at 271.

Subsequently, however, this Circuit has declared that the rule "should be strictly contained within narrow confines and limited to the purposes which brought it into being," since it is an "invasion of the established contract rights of lienholders." Johnson Fare Box Co. v. Doyle, 250 F.2d 656, 657 (2 Cir.), cert. denied, 357 U.S. 938, 78 S.Ct. 1385, 2 L. Ed.2d 1551 (1958). Thus, in a recent case, Judge Bryan, noting the admonition of the Court of Appeals, refused to recognize the priority of claims filed in a Chapter X proceeding against a steamship company on the ground that there was no showing of a compelling public interest in the continued operation of the debtor's business, nor any substantial class of lienholders whose interest would have been jeopardized had credit not been extended by the claimants. In re No. Atlantic & Gulf S. S. Co., 200 F.Supp. 818 (S.D.N.Y.), aff'd sub nom., Schilling v. McAllister Bros., Inc., 310 F.2d 123 (2 Cir. 1962).[8]

Assuming that it is the public interest in the continued operation of a transportation system or a utility company, rather than a broader principle of equity, that constitutes the backbone of the rule, see In re Pusey & Jones Corp., 192 F.Supp. 233, 235 (D.Del.), aff'd, 295 F.2d 479 (3 Cir. 1961), it may not be readily apparent why a priority should be granted a claim against a common carrier by rail and denied a claim against a common carrier by motor vehicle. The Pennsylvania argues with some force that "it is illogical to make the right to * * * [priority] dependent upon the road-bed utilized by the debtor carrier," and cites one case

---

distinction between such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out."

7. It has been suggested that application of the rule to hotels is also defensible on the theory that a hotel is a quasi-public corporation. Jacobson, Shall the Six Month Priority Rule be Applied to Hotel Receiverships, 40 Comm.L.J. 568 (1935). Federal cases in which the "six-months rule" has clearly been applied to a purely private corporation are few, see Olyphant v. St. Louis Ore & Steel Co., 22 F. 179 (C.C. E.D.Mo.1884); cf. Bowen v. Hockley, 71 F.2d 781 (4 Cir. 1934). A number of state courts, viewing the rule as essen-

tially equitable in nature, have extended it to private corporations, Le Hote v. Boyet, 85 Miss. 636, 38 So. 1 (1905); People's Nat'l. Bank v. Virginia Textile Co., 104 Va. 34, 51 S.E. 155 (1905); Drennen v. Mercantile Trust & Deposit Co., 115 Ala. 592, 23 So. 164, 39 L.R.A. 623 (1897), but allowance of the priority usually has been confined to wage claims, see A. H. George Co. v. Pigford, 97 Miss. 332, 52 So. 796 (1910).

8. The question of the applicability of the "six-months rule" apparently was not raised on appeal. See Briefs for Appellant and Appellee, 310 F.2d 123 (2 Cir. 1962).

recognizing the priority of a claim by a motor carrier for freight charges collected by another motor carrier for through transit on a joint haul, In re Missouri Motor Distrib. Corp., 21 F.Supp. 13 (W. D.Mo.1937).

To the contrary, however, is In re Richards, 43 F.Supp. 733 (M.D.Pa.1942), in which it was held that a claim for fuel and lubricants furnished to a common carrier by motor vehicle within six months immediately preceding the filing of a petition for an arrangement was not entitled to priority. The Court distinguished the railroad cases on the ground that the operations of a motor carrier "can be duplicated without the acquisition of property by eminent domain and without the investment of large sums of money and which is in fact duplicated by competitors at the present time." Id. at 734–35. A recent survey of motor carrier regulation lends considerable support to the conclusion that the policy reasons responsible for the evolution of the "six-months rule" in railroad receiverships are not as compelling with respect to motor common carriers. Note, National Transportation Policy and the Regulation of Motor Carriers, 71 Yale L. J. 307, 327–28 (1961).

In any event, whatever the relevant economic arguments or equitable considerations, Chapter XI itself appears to preclude application of a priority rule developed in federal equity receivership cases to a claim asserted in an arrangement proceeding. The Pennsylvania supports its claim to priority in a Chapter XI arrangement by pointing out that the "six-months rule" has been recognized in proceedings under Section 77 and Chapter X of the Bankruptcy Act ("the Act"). But its argument fails to take account of a basic difference in the legislative design of the respective provisions of the Act. Section 77 specifically directs that determination of the priority of unsecured claims be made upon principles applicable in equity receiverships, and these in-

clude the "six-months rule." See Southern Ry. Co. v. Flournoy, 301 F.2d 847, 850–53 (4 Cir. 1962). Similarly, under Section 115 of the Act, equity principles of classification may be used to ascertain priorities in Chapter X reorganizations. Dudley v. Mealey, supra; In re Sixty-Seven Wall Street Restaurant Corp., 23 F.Supp. 672 (S.D.N.Y.1938). Priorities in Chapter XI arrangements, however, are specifically enumerated in Section 64 of the Act. See 11 U.S.C. § 702. This Section neither expressly recognizes the "six-months rule" nor constitutes a blanket authorization for the importation of general equitable doctrines.

Recently, the Court of Appeals for the Third Circuit held the "six-months rule" inapplicable to claims asserted against a paper-making machine company in a Chapter XI proceeding which was superseded by a bankruptcy proceeding. The Court stated with regard to the exclusivity of the priority provisions of the Act:

"The bankruptcy statute has specific provisions concerning the order in which claims are arranged for distribution of a bankrupt's estate. We think it is undesirable to create a new class of creditors by judge-made rules which would transcend the provisions carefully worked out in the bankrupty act. If a new class of preferred creditors is to be established it should be done by the statute and not by ourselves."

In re Pusey & Jones Corp., 295 F.2d 479, 480–81 (3 Cir. 1961), affirming 192 F. Supp. 233 (D.Del.).

This seems to me to be the correct view. The statute was similarly construed by Judge Dawson in In re American Anthracite & Bituminous Coal Corp., 171 F.Supp. 377, 384 (S.D.N.Y.1959), in which a claim for demurrage was denied priority in a Chapter XI proceeding involving an exporter of coal. The Court of Appeals, although omitting specific reference to the "six-months rule," [9] af-

9. Apparently, this issue was not pressed upon appeal. See Brief for Appellant, American Anthracite & Bituminous Coal

Corp. v. Leonardo Arrivabene, S.A., 280 F.2d 119 (2 Cir. 1960).

firmed the decision of the District Court, stating generally that "the right to priority in Chapter XI proceedings is governed *solely* by § 64 of the Bankruptcy Act." American Anthracite & Bituminous Coal Corp. v. Leonardo Arrivabene, S.A., 280 F.2d 119, 124 (2 Cir. 1960) (Emphasis added).

■■■ Claimant argues, however, that the "six-months rule" is a "law of the United States" within the meaning of subdivision (5) of Section 64(a), which gives a priority to:

"(5) debts owing to any person, including the United States, who by the laws of the United States in (sic) entitled to priority * * *."

I do not agree. To date, the only "law" deemed to come within this provision, as amended,[10] has been Section 3466 of the Revised Statutes, 31 U.S.C. § 191, which establishes a general priority for debts due the United States. See Small Business Adm'n v. McClellan, 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200 (1960); In re Peoria Consol. Mfrs., Inc., 286 F.2d 642 (7 Cir. 1961). It is extremely doubtful that the present scope of the reference extends beyond 31 U.S.C. §§ 191–93, see 3 Collier, Bankruptcy ¶ 64.502[1], at 2227 (14th ed. 1961). While it is said that a bankruptcy court sits as a court of equity, see Pepper v. Litton, 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939), "the exercise of its equitable powers must be strictly confined within the prescribed limits of the Bankruptcy Act," Guerin v. Weil, Gotshal & Manges, 205 F.2d 302, 304 (2 Cir. 1953). The purpose of Section 64 of the Act was to provide "a hard and fast categorical classification of claims * * *." In re Sixty-Seven Wall Street Restaurant Corp., supra at 673. Where Congress intended that special priorities be granted, "it has carefully enumerated them, and any omissions must be construed as express exclusions * * *." Guerin v. Weil, Gotshal & Manges, supra at 304.

■■ The cases cited by the Pennsylvania to support the proposition that the "six-months rule" is applicable in a Chapter XI proceeding are all distinguishable.[11] Precedent and policy, therefore, compel the conclusion that the rule is not applicable in a Chapter XI proceeding, and the Pennsylvania's claim to priority based upon it should be rejected.

In addition to the arguments discussed above, the Pennsylvania has also asserted that its claim for "piggy-back" services created an equitable lien on the Debtor's property, outranking the claims of other lienholders and general creditors.[12] It is established, however, that if the type of claim asserted here is entitled to priority treatment, it acquires that status "not because the * * * [creditor] to whom such * * * [debt is] due * * * [has] in law a lien upon the mortgaged property or the income," but because the claimant comes within a special class of general creditors. Fosdick v. Schall, su-

---

10. A 1938 amendment made state statutes, other than those affecting rent, no longer applicable under Section 64a(5) as they were under former Section 64b(7). The purpose of the amendment was to reduce the number of priorities consuming debtors' estates. See 3 Collier, Bankruptcy ¶ 64.501, at 2224 (14th ed. 1961), citing H.R. 12889, 74th Cong., 2d Sess. 201 (1936).

11. The cases cited in the Pennsylvania's Brief at pp. 12–17 involved the assertion of equitable or legal liens, e. g., Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); In re Quaker City Uniform Co., 238 F. 2d 155 (3 Cir. 1956), cert. denied, sub nom. Veloric v. College Hall Fashions &

Synthetic Specialists, Inc., 352 U.S. 1030, 77 S.Ct. 596, 1 L.Ed.2d 599 (1957); Porter v. Searle, 226 F.2d 748 (10 Cir. 1955); Wickes Boiler Co. v. Godfrey-Keeler Co., 116 F.2d 842 (2 Cir. 1940), affirmance upheld on rehearing, 121 F.2d 415 (2 Cir.), cert. denied, 314 U.S. 686, 62 S.Ct. 297, 86 L.Ed. 549 (1941); In re White, 58 F.2d 203 (2 Cir. 1932). Consequently, they are distinguishable from the instant case in which a right to priority is being asserted by a creditor having an unsecured claim. For a discussion of the critical difference between a valid lien and a right to prior payment, see 3 Collier, Bankruptcy ¶ 64.02, at pp. 2061–62 (14th ed. 1961).

12. Brief of Pennsylvania, pp. 6–10.

pra at 253, 25 L.Ed. 339.[13] The Pennsylvania's argument is thus but another way of urging the applicability of the "six-months rule" in Chapter XI proceedings, which has already been discussed and rejected.[14] Accordingly, on this portion of the case, the Pennsylvania must fail.

## II

The Pennsylvania contends, alternatively, that the proceeds received by the Debtor from its shippers and consignees, to the extent they are attributable to the "piggy-back" hauls, constitute trust funds for its benefit, and consequently are not part of the Debtor's estate.

■ The Referee's findings of fact should be accepted by the Court unless they are shown to be "clearly erroneous." General Orders in Bankruptcy, No. 47; Morris Plan Industrial Bank v. Henderson, 131 F.2d 975 (2 Cir. 1942); In re Bifulci, 154 F.Supp. 629 (S.D.N.Y.1957). The Pennsylvania has failed to persuade me that the Referee's findings relevant to the "trust fund" theory are clearly erroneous or that his legal conclusions are wrong.

■■ The formation of a trust relationship is dependent upon the intention of the parties, which, if not clearly indicated by the language of the parties, is to be inferred from all the circumstances. 1 Scott, Trusts § 12.2 (2d ed. 1956). The following are some of the facts which lead me to conclude, as did the Referee, that the relationship between the parties here was one of creditor and debtor, and not trustee and beneficiary: the absence of an agreement between the Pennsylvania and the Debtor to apportion total charges; the lack of relationship between the amount due the Pennsylvania from the Debtor and the overall charge made by the Debtor to its customer; the unconditional duty of the Debtor to pay freight charges to the Pennsylvania within fifteen days from the day of billing, and the "credit accommodation" clause in the "divisional sheet."

■ The Pennsylvania has cited a number of cases in support of its trust theory, which are distinguishable on the ground that they involved statutes expressly creating a trust relationship[15] or because of such factual differences as the existence of an agreement to apportion charges.[16] The Pennsylvania also relies on Southern Ry. Co. v. United States, 306 F.2d 119 (5 Cir. 1962), in which an arrangement between two railroads called for proportional division of the revenue with an accounting four times a month. Analysis of that decision indicates that, if anything, it is more harmful than helpful to the Pennsylvania's claim. The Court there did not disapprove of the finding of a Special Master that the traffic balance funds in question did not constitute trust funds, and, in any event, held that the traffic balance claim was not entitled to preference over tax claims. In essence, the Pennsylvania's position seems to be that because the Debtor may have had a duty to account to the Pennsylvania for the funds it collected, a trust relationship was necessarily created. But such is not the case. In the Matter of Yeager Co., 315 F.2d 864 (6 Cir. 1963).

For the reasons stated above, the Pennsylvania's petition is denied.

So ordered.

13. But cf. Larsen v. New York Dock Co., 166 F.2d 687, 689 n. 2 (2 Cir. 1948), in which Judge Frank referred to the "six-months rule" as creating "an admiralty lien upon wheels."

14. See note 11 supra and accompanying text.

15. City of New York v. Rassner, 127 F.2d 703 (2 Cir. 1942); Wickes Boiler Co. v. Godfrey-Keeler Co., 116 F.2d 842 (2 Cir. 1940), affirmance upheld on rehearing, 121 F.2d 415 (2 Cir.), cert. denied, 314 U.S. 686, 62 S.Ct. 297, 86 L.Ed. 549 (1941); In re Airline-Arista Printing Corp., 156 F.Supp. 403 (S.D.N.Y. 1957), aff'd per curiam, 267 F.2d 333 (2 Cir. 1959).

16. Such an agreement distinguishes Atlantic Coast Line R.R. v. Pennsylvania R.R., 12 F.Supp. 720 (E.D.Pa.1935), also cited by the Pennsylvania in support of its position.