218 F.2d 166
 Guy A. THOMPSON, Trustee, Missouri Pacific Railroad Company,
Debtor; and Missouri-Illinois Railroad Company, a
corporation, Appellants,
v.
ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellee.
 No. 15038.
 United States Court of Appeals, Eighth Circuit.
 Dec. 23, 1954.
Writ of Certiorari Denied March 14, 1955.
See 75 S.Ct. 525.
 
 Toll R. Ware, St. Louis, Mo. (Thos. T. Railey, George W. Holmes, St. Louis, Mo., were with him on the brief), for appellants.
 John E. McCullough, St. Louis, Mo. (James L. Homire, Alvin J. Baumann, and Ernest D. Grinnell, Jr., St. Louis, Mo., were with him on the brief), for appellee.
 Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.
 WOODROUGH, Circuit Judge.
 
 
 1
 This appeal is taken to reverse the judgment rendered in favor of the plaintiff in the action St. Louis-San Francisco Railway Company against the defendant Missouri-Illinois Railroad Company[1] in the sum of $361,078.05 with interest and costs in accord with the findings of fact and conclusions of law drawn as directed by the district court in its opinion in the case reported at 117 F.Supp. 57, 58.
 
 
 2
 As stated in that opinion, the suit was one 'arising out of a dispute between the plaintiff and defendants over the division of revenue arising from the transportation of 7,131 tank cars of crude petroleum oil, transported from Greig, Oklahoma, to Selmaville, Illinois, during the period from June 1, 1944 to October 31, 1945. The parties plaintiff and defendants are railroads engaged in interstate commerce, subject to the Interstate Commerce Act, and while all parties are Missouri corporations jurisdiction of this court is conferred by the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.
 
 
 3
 'The cars in question were routed via the St. Louis-San Francisco Railway Company (hereinafter referred to as Frisco), from Greig, Oklahoma, to St. Louis, Missouri, thence via Missouri-Pacific Railroad Company (hereinafter referred to as Missouri Pacific), to Flinton, Illinois, thence via Missouri-Illinois Railroad Company (hereinafter referred to as Missouri-Illinois), to Selmaville, Illinois, and so moved. This routing of the cars was over a through route to which a joint through rate was applicable. The division of the freight rates was made by the Missouri-Illinois, the settling carrier, and 22% of the total revenue was allotted to the Missouri-Illinois, and 78% to the Frisco and Missouri Pacific, of which 78% the Frisco was allotted 65% and the Missouri Pacific 35%.
 
 
 4
 The plaintiff objected to the division as made, claiming that the total amount of $1,322,630.31 which was collected by application of the lawful joint tariff for the transportation from Greig, Oklahoma, a station of the Frisco in Southwestern Territory, to Selmaville, Illinois, a station on the Missouri-Illinois Railroad in Illinois Freight Association Territory moving through the St. Louis-East St. Louis Gateway and interchanged thereat, was lawfully required to be 78% to the carrier within the Southwestern Territory, namely, the plaintiff Frisco, and 22% to the defendant carriers within the Illinois Freight Association Territory, namely, the Missouri-Illinois and the Missouri Pacific.
 
 
 5
 The Frisco accordingly brought this action to recover the percentage which it claimed to be its lawful share and the Court having found that it had jurisdiction under the Interstate Commerce Act, declared that 'The only question before fore the court is whether the Missouri-Illinois, the settling carrier, properly divided the revenue.' The court stated, 'It is undisputed that Southwestern Lines Division Sheet 100 and the supplements thereto in force and effect during the period in which the shipments were made governed the division of revenue. The Missouri-Illinois interpreted the Division Sheet and supplements thereto as providing that the gateway for division purposes was Flinton, Illinois, whereas the plaintiff contends that the gateway for division purposes was St. Louis, Missouri-East St. Louis, Illinois. The question for the court is the interpretation of the contracts between the parties, to wit, the Division Sheet and the supplements thereto, since they form the basis for division of revenue. Division Sheet 100 when originally issued in 1931 did not apply to the Missouri-Illinois. As a result of the supplements to the Division Sheet after 1942, by agreement the Missouri-Illinois made the Division Sheet applicable to it. Under the Division Sheet as originally issued, St. Louis-East St. Louis was one of the divisional gateways, and when the Missouri-Illinois became a party to the Division Sheet, Kellogg, Illinois, was established as one of the divisional gateways, and thereafter Flinton, Illinois, was established as one of the divisional gateways. It is undisputed that in certain instances under the Division Sheet and the supplements thereto, St. Louis, Missouri-East St. Louis, Illinois; Kellogg, Illinois; and Flinton, Illinois, are divisional gateways. With respect to the shipments in question, the interchange at Flinton was intra rather than interterritorial, and under the principles and formula set up in Division Sheet 100 and supplements thereto, the gateway for division purposes on the freight in question would be at St. Louis, Missouri-East St. Louis, Illinois, unless there was a specific exception making Flinton the gateway. The supplements set forth a number of exceptions to the principles and formula of the Division Sheet, but the court is unable to find any exception with respect to the movement in question. The Division Sheet does not deal with each gateway individually, but assumes that certain principles will determine which gateway governs, unless specifically provided to the contrary. There is nothing in the supplements to the Division Sheet to indicate that St. Louis, Missouri-East St. Louis, Illinois, is not the division point, and absent such a specific provision, the broad plan and its established principles would lead us to the conclusion that St. Louis-East St. Louis was the gateway for division purposes for the shipments in question, since it was at that point that there was an interchange between the two territories and between carriers. The plaintiff is therefore entitled to judgment with interest from the date of its demand.'
 
 
 6
 In preparing the findings, conclusions and judgment, St. Louis, Missouri-East St. Louis, Illinois, was used as the gateway for the purpose of dividing the revenue rather than the station Flinton, Illinois, which had been used by the Missouri-Illinois. It is agreed that if the court had jurisdiction and if St. Louis instead of Flinton was the applicable gateway and if the suit was timely brought, the judgment was right.
 
 
 7
 (1). As to the findings of fact.
 
 
 8
 Appellants contend for reversal that the trial court erred in making findings of fact numbered 15, 16 and 17, which read as follows:
 
 
 9
 '15. The evidence sustains a principle-- the Docket 15234 principle-- that on all interterritorial traffic between Southwestern Territory and Western Trunk Line-Illinois Freight Association Territory the gateway on the boundary where the traffic passes from one territory to another is the governing gateway for interterritorial divisional purposes, not only when interchange occurs at that gateway but also when traffic passes through it without interchange, unless there is a specific provision in Division Sheet 100 (or its supplements) or an agreement to the contrary.
 
 
 10
 '16. There are no specific exceptions in Division Sheet 100, or any of its supplements, or any agreements which would nullify St. Louis-East St. Louis as the interterritorial divisional gateway on the traffic here in issue.
 
 
 11
 '17. St. Louis, Mo.-East St. Louis, Ill., is the interterritorial divisional gateway on the traffic here involved.' The position of appellants is that 'the primary divisions in dispute break on Flinton, Illinois' and that such division is 'specifically required by the provisions of Item 66 of Supplement 46 and applicable reissues thereof to Southwestern Lines Division Sheet 100.'
 
 
 12
 In support of their position they stress that Missouri-Illinois was not a party to the proceedings before the Interstate Commerce Commission in Docket No. 15-234 Division of Freight Rates (1928), 148 ICC 457; 156 ICC 94, and that the divisions as published in Southwestern Lines Division Sheet 100 were not prescribed divisions as to it. They argue that their divisions are not by compulsion of an interstate Commerce order but by voluntary agreement. They concede and assert as found by the trial court that the Interstate Commerce Commission in arriving at its cease and desist order in Docket 15234 adopted and enforced a principle referred to as the '15234 principle' to the effect that 'the interterritorial divisional break should be made at the gateway at which the traffic passes from one territory to another' but they contend that the division here involved is not controlled by that principle. They contend that the following provisions of Item 66-B of Supplement 52 to Southwestern Lines Division Sheet 100 require that Flinton be taken as the gateway for division of the moneys in question:
 
 
 13
 'Special application to and from points of Missouri-Illinois Railroad.
 
 
 14
 'The basis of divisions published herein to and from points on the Missouri-Illinois are subject to application rules and regulations published in the Division Sheet as amended except as follows:
 
 
 15
 '* * * *
 
 
 16
 '(b) Between M-I RR stations in Illinois and the Southwest (section 2).
 
 
 17
 '(2) Factors to and from Kellogg, Ill., will also apply to or from Flinton, Ill.' * * *
 
 
 18
 A witness for the defendants also presented assumed through freight movments and divisions thereon which it was contended illustrated and confirmed the defendants' claim that Flinton was the proper gateway for revenue division purposes herein.
 
 
 19
 On the other hand, the plaintiff contended in the trial court and repeats here that the findings 15, 16 and 17 are supported by substantial evidence. It agrees that Item 66 is the item of Division Sheet 100 which identifies the exceptions from the general provisions of the Division Sheet applicable to and from Illinois and Southwestern territory, paragraph (a) of that item being exceptions to the general application of the Sheet dealing with points on that railroad in Missouri and (b) being the exceptions dealing with the points in Illinois. But it contends that the words at the end of the opening paragraph 'except as follows' are not meant to exclude all of the portions of the Division Sheet except those which follow in Item 66 itself. They are not intended to and do not constitute Flinton, Illinois, as the gateway for the traffic in question. On the contrary, they mean when considered in their context that if and when Flinton, Illinois, may by some appropriate provision of Division Sheet 100 or by agreement, be made the applicable gateway in a given case the factors to use in making the division will be the Kellogg, Illinois, factors. Admittedly, no such provision is made elsewhere in Division Sheet 100 or by separate agreement so far as the involved shipments are concerned, and it is insisted for appellee that as to such shipments that such a provision would be inconsistent with the application of the Division Sheet.
 
 
 20
 In that regard appellee points out that Flinton, Illinois, is not located on the boundary of two territories and the shipments did not there pass from one territory to another, but did so at St. Louis. Flinton could not, therefore, be taken as the gateway under Division Sheet 100 without some specific application in the Sheet or other agreement providing therefor. The testimony for the plaintiff tended to show that in all instances where departures from or exceptions to the Docket 15234 principle have been made in divisions on shipments which have passed from Southwestern to Illinois Freight Association Territory there is involved service performed by a Southwestern carrier to (or from) and through a named gateway without interchange with continuing service (by either the same line or by that line in conjunction with another line otherwise identified in the Sheet as a Western Trunk Line-Illinois Freight Association carrier) in Western Trunk Line-Illinois Freight Association Territory to (or from) another named gateway and there interchanged for service to (or from) a destination (or origin) in Western Trunk Line-Illinois Freight Association Territory.
 
 
 21
 On consideration of the evidence, we think that each of the findings, 15, 16 and 17, is supported by substantial evidence and none is clearly erroneous. We think that when Division Sheet 100 is considered in its entirety and effect is given to the principle established by the Interstate Commerce Commission in Docket 15234 in Compliance with which the Division Sheet 100 and Supplements are issued, it must be held that St. Louis-East St. Louis, through which the shipments here passed from one territory to the other and at which they were interchanged, was the proper territorial gateway to be used for division of revenue in this case. It clearly appears that the judgment of the district court is supported by past practice and also that it results in compensation to all parties reasonably related to the service. The evidence[2] is that Frisco carried each shipment 535.3 miles from Greig, Oklahoma, to St. Louis, Missouri; Missouri Pacific carried them 53.3 miles and Missouri-Illinois 75.4 miles, a total for the two of 128.7 miles. The judgment awarded the Frisco 78% and the other two roads 22%. The use of Flinton as the gateway resulted in 50.7% for transporting the shipment 80.6% of the total distance and 49.3% for transporting it 19.4% of the distance.
 
 
 22
 (2). As to Jurisdiction.
 
 
 23
 Appellants have earnestly insisted that there was no jurisdiction of this action in the federal district court. It was admitted that there was no diversity of citizenship and appellants argue that the action should be considered as simply an action for money due under a contract or for an accounting for moneys received for the use of the plaintiff. But we affirm the holding of the trial court that 'jurisdiction of this court is conferred by the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq.'
 
 
 24
 The essential purpose of the action was to enforce a right of the plaintiff to have the defendants perform a duty prescribed by Section 1(4) of the Act which provides:
 
 
 25
 'It shall be the duty of every common carrier subject to this part * * * in case of joint rates, fares, or charges, to establish just, reasonable and equitable divisions thereof * * * which shall not unduly prefer or prejudice any of such participating carriers.'
 
 
 26
 The duty to 'establish' the just divisions can not be construed as limited to merely signing writings concerning them. As used in the text, the duty to 'establish just divisions' meant to originate, agree upon and apply such divisions in conducting the business to which the statutory regulation applies. As stated by the Supreme Court in Alton Railroad Co. v. United States, 287 U.S. 229, loc. cit. 235-236, 53 S.Ct. 124, 126, 77 L.Ed. 275, 'each carrier is entitled as of right to the divisions * * * agreed upon', and the duty to make the division according to law derives directly from the Interstate Commerce Act.
 
 
 27
 Sections 8 and 9 of the Interstate Commerce Act provide authority to sue for any part of interstate freight divisions claimed to be wrongfully withheld from one carrier by another. The sections provide:
 
 
 28
 'That in case any common carrier subject to the provisions of this part * * * shall omit to do any act, matter, or thing in this part required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this part * * *. (49 U.S.C.A. § 8.)
 
 
 29
 'That any person or persons claiming to be damaged by any common carrier subject to the provisions of this part may either make complaint to the commission as hereinafter provided for, or may bring suit in his or their own behalf for the recovery of the damages for which such common carrier may be liable under the provisions of this part, in any district court of the United States of competent jurisdiction; * * *. (49 U.S.C.A. § 9).'
 
 
 30
 The federal courts have long exercised jurisdiction of suits brought to enforce duties imposed upon carriers by the Interstate Commerce Act. In re Lennon, 166 U.S. 548, 553, 17 S.Ct. 658, 41 L.Ed. 1110; Produce Terminal Realty Corporation v. New York, N.H. & H. Railroad Co., D.C., 116 F.Supp. 451.
 
 
 31
 In addition to Sections 8 and 9 of the Interstate Commerce Act, the jurisdiction is plainly conferred by Section 1337 of the Judicial Code, 28 U.S.C.A. § 1337, which provides:
 
 
 32
 'The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce * * *.'
 
 
 33
 In development of the regulation of the nation's railroads the regulation of the rates charged by the individual roads in interstate commerce was followed by regulation of the joint rates and a vital element of the regulation of joint rates was regulation of the division of them among the carriers jointly engaged in the interstate haul. The defining of territories and establishment of gateways and their use for purposes of such divisions was a necessary incident. Where, as in this case, the complaint is that a carrier subject to the Act has denied the plaintiff the share of joint revenue due it by reason of a controlling principle established by the Interstate Commerce Commission, the action arises under the Act regulating Commerce, within the intendment of Section 1337.
 
 49 U.S.C.A. preceding Section 1, reads:
 
 34
 'It is hereby declared to be the national transportation policy of the Congress * * * to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; * * *. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy.'
 
 
 35
 As the fixing of gateways to be used for division of joint revenues is a fundamental part of the function of division of joint transportation receipts the dispute as to the point to be used for the purpose of division here presents a federal question. The intent of Congress is to accomplish uniform regulation and it is necessary that there be a single authority to settle the division of the proceeds of joint traffic which passes over more than one state. Although the Division Sheets 'issued in compliance with Interstate Commerce Commission Opinion and Order' are not strictly tariff sheets or published as such, substantially the same grounds of federal jurisdiction are present in respect to a suit to recover a part of a division for interstate transportation under the Division Sheets as over a suit to recover sums due from a shipper under a published tariff. We find no error in the ruling that the court had jurisdiction.
 
 
 36
 (3) As to the Statute of Limitations.
 
 
 37
 Appellants contend that plaintiff's cause of action was barred by the statute of limitations, Section 16(3)(a) and 16(3)(e), of the Interstate Commerce Act in that the suit was not begun within two years after the cause of action accrued. As shown by stipulation, the transportations here involved occurred during the period June 1, 1944 to October 31, 1945, and formal demand for payment was made upon the defendant Missouri-Illinois Railroad Company in accordance with the applicable accounting rules of the carriers on August 25, 1947. The suit was brought January 29, 1952.
 
 
 38
 Section 16(3)(a) and 16(3)(e) reads as follows:
 
 
 39
 'Section 16(3)(a) All actions at law by carriers subject to this part for recovery of their charges, or any part thereof shall be begun within two years from the time the cause of action accrues, and not after.'
 
 
 40
 'Section 16(3)(e) The cause of action in respect of a shipment of property shall, for the purposes of this section, be deemed to accrue upon delivery or tender of delivery thereof by the carrier, and not after.
 
 
 41
 Appellants' contention is that the lapse of time before commencement of the action 'destroyed the liability'. Their reliance is upon Midstate Horticultural Co. v. Pennsylvania R. Co., 320 U.S. 356, 64 S.Ct. 128, 88 L.Ed. 96.
 
 
 42
 But the precise question was considered by the court in Atlantic Coast Line R. Co. v. Baltimore & Ohio R. Co., D.C., 12 F.Supp. 711, loc. cit. 718-719, and we are in accord with the court's declaration in that case that 'these provisions (49 U.S.C.A. § 16(3)(a-c)) seem to contemplate actions or complaints between carriers and shippers, and not between carriers only. (a) and (c) also seem clearly inapplicable because the complaint here is not for the recovery of 'charges' or 'overcharges." That decision appears to have been accepted by the railroads since its promulgation in 1935 without any protest that we know of by the Interstate Commerce Commission which is primarily charged with the railroad regulation involved in divisions from interterritorial hauls. And we adhere to it.
 
 
 43
 We find no error in the judgment appealed from and affirm it at appellants' costs.
 
 
 44
 JOHNSEN, Circuit Judge (concurring).
 
 
 45
 I have been unable to persuade myself that there was not a sufficient basis, on the entire documentary situation, facially and contextually, for the trial court to hold, as it did, that in the correlation of Item 66-B with Division Sheet 100, under the recognized control of the Division Sheet by the Docket 15234 principle, the language of paragraph (b)(2) of Item 66-B was not sufficient, in specificness, unambiguity and lack of other possible meaning, to require that it be accorded the legal effect of, and accepted as a standard for, limiting or nullifying in the situation the application of the interterritorial primary-division breaking-point rule. I accordingly concur in this part of Judge Woodrough's opinion.
 
 
 46
 The only portion of the opinion that has bothered me somewhat is the construction made of 49 U.S.C.A. § 16(3)(a) and (e), through the adoption of Judge Chesnut's language in Atlantic Coast Line R. Co. v. Baltimore & O.R. Co., D.C.Md., 12 F.Supp. 711, 718, that 'These provisions seem to contemplate actions or complaints between carriers and shippers, and not between carriers only.' I can see no reason no the statute to believe that, when Congress deemed it advisable, in the interest of uniformity and certainty, to impose a limitation on 'All actions at law by carriers * * * for recovery of their charges, or any part thereof', it was in any way concerned about or intending to have regard for any theories, forms, technicalities and distinctions in common law actions of recoveries. I think it was fixing a time, as a general transportation-code policy, within which a carrier had to act to recover its transportation charges or revenues against anyone who owed it the duty of making payment thereof as such. And certainly what is here being recovered is in fact transportation charges or revenues.
 
 
 47
 Both of my colleagues, however, feel that Judge Chesnut's construction of the statute has probably had such acceptance and reliance in the railroad world as to be entitled to stand on the basis of stare decisis. I am without any enlightenment or data in the situation on this score, either from the briefs or otherwise, but I shall, for the sake of unanimity, go along and accept my colleagues' respected view on the point.
 
 
 48
 SANBORN, Circuit Judge (dissenting).
 
 
 49
 I have been unable to discover any satisfactory reason for deciding that the division of the freight revenue in suit based on Flinton, Illinois, was unlawful. I agree that if the applicable supplement to Division Sheet 100 adding Flinton as a gateway for traffic from the Southwest to points on the Missouri-Illinois Railroad Company is ambiguous with respect to the division of revenues on such traffic, the conclusion of the District Court should not be overturned. But the fact that the division of revenue of which the appellee complains is unfair to it would not, in the absence of ambiguity, justify a court in amending the applicable Division Sheet as supplemented.
 
 
 50
 It seems to me that the record shows that the Missouri-Illinois Railroad Company became a party to the Division Sheet in suit upon the understanding, adequately expressed, that revenues derived from traffic from the Southwest destined for points on its line and received at either Kellogg or Flinton should be divided 22% to it and 78% to the carrier or carriers which transported the shipments to either of those gateways. Apparently, Kellogg and Flinton were the only points through which traffic from the Southwest could move to points on the Missouri-Illinois Railroad. The expert witnesses who testified seem to have been in substantial accord with respect to the proposition that if it had been intended to exclude Flinton as a basing point for the division of revenue on shipments such as those in suit, there should have been an exception in paragraph (b) of Item 66-B of the applicable supplement to the effect that divisions via Kellogg or Flinton would not apply on traffic from the Southwest interchanged at East St. Louis, Illinois, or St. Louis, Missouri.
 
 
 51
 I agree that the District Court had jurisdiction of this action, and that the claim of the appellee was not barred or extinguished by limitations. I am, however, of the opinion that there was an inadequate basis for determining that the Missouri-Illinois Railroad Company's division of the joint revenue on the traffic in suit was unlawful. The judgment appealed from should, I think for that reason only reversed.
 
 
 
 [1]
 The Missouri Pacific defendant below and co-appellant here, owns a majority of the voting stock of the Missouri-Illinois and has an option on the remainder
 
 
 [2]
 Taken from appellee's brief and not disputed